IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2017 Session

**STATE OF TENNESSEE v. MELISSA L. LOPEZ**

**Appeal from the Circuit Court for Anderson County**
**No. B2C0443B       Donald R. Elledge, Judge**

_____

**No. E2016-02410-CCA-R3-CD**

_____

An Anderson Circuit Court Jury convicted the Appellant, Melissa L. Lopez, of aggravated child neglect, and the trial court sentenced her as a Range I, standard offender to twenty years in the Tennessee Department of Correction.  On appeal, the Appellant contends that the evidence was insufficient to sustain her conviction, arguing that the State failed to prove her neglect resulted in the victim's injuries.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Kevin C. Angel (at motion for new trial and on appeal) and J. Thomas Marshall (at trial), Clinton, Tennessee, for the Appellant, Melissa L. Lopez.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; David S. Clark, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On July 10, 2012, the Anderson County Grand Jury returned an indictment charging the Appellant with aggravated child abuse or neglect of the victim, her infant son,[1] under three alternative theories: (1) that the abuse or neglect caused serious bodily injury, (2) that the act of neglect or endangerment resulted in serious bodily injury, or (3)

_____

[1] In accordance with this court's policy, we will not identify the minor victim by name.

that the act of neglect or endangerment was especially heinous, atrocious, or cruel or involved the infliction of torture. On April 9, 2015, the trial court granted the State's motion to amend the indictment to delete two alternative theories and the allegation of abuse so that the remaining charge was aggravated child neglect resulting in serious bodily injury.

At trial, Detective Jock Coleman with the Oak Ridge Police Department testified that at approximately 9:00 p.m. on Monday, November 24, 2008, he and LaToya Shepherd with the Department of Children Services (DCS) went to East Tennessee Children's Hospital (Children's Hospital) to see the victim. A nurse directed Detective Coleman and Ms. Shepherd to a room in the pediatric intensive care unit (ICU). When Detective Coleman and Ms. Shepherd entered the room, they saw the male victim, who appeared to be approximately ten months old, lying quietly in a crib. He had injuries that appeared to be burns on his fingers, leg, arm, and buttocks, and he had bruising on his right ear. Detective Coleman took photographs of the victim's injuries. The photographs were shown to the jury.

The Appellant was also in the victim's room. During a conversation with Detective Coleman and Ms. Shepherd, the Appellant said that the victim's date of birth was January 4, 2008. She stated that when she woke the victim from his nap on the night of Wednesday, November 19, she noticed blisters on his right "pinkie" finger and the toes of his left foot. She popped the blisters in an attempt to make them go away. The next morning, she saw more blisters on his lower left leg and his buttocks. She called a doctor and was told to take him to a doctor or a hospital that day, but she did not take the victim for treatment because she did not have gas in her car and did not have enough money to buy gas. Detective Coleman asked the Appellant if she called an ambulance for the victim, and she acknowledged that she did not. Detective Coleman asked how the victim's injuries occurred. The Appellant responded that on Wednesday night, she gave the victim a bath and that the bath water "was a little warm." The Appellant gave no further explanation for the victim's injuries.

Detective Coleman said that the victim's injuries appeared to be a "caustic burn." On Tuesday, November 25, he went to the Appellant's residence on South Benedict Avenue in Oak Ridge to see if he could find the substance that caused the victim's injuries. In the bathroom, he found a bottle of acid in a bowl and a bottle of glass cleaner on the counter near the sink. He found disinfectant cleaner in a mop bucket in the hall next to the bathroom and an empty bottle of automatic transmission fluid in the living room. Detective Coleman opined that the victim's injuries could have been caused by any of the foregoing substances but that he never discovered "to [his] satisfaction" what caused the victim's burns. Detective Coleman also seized the victim's car seat and the eye drops that were used to treat the victim's "pink eye."

On cross-examination, Detective Coleman recalled that the Appellant explained she did not take the victim to the hospital in Oak Ridge because of a negative experience there. He remembered that the victim's eyes were swollen shut and that the Appellant said she had given the victim the eye drops for pink eye. Detective Coleman said that he and the Appellant were neighbors in 2000, that he remembered her two older children, and that he had seen nothing to concern him regarding those children.

Detective Coleman said that when he searched the Appellant's residence, the "house was in disarray" and that most of the items he seized were in plain sight. He said that he did not see any aloe in the house but acknowledged that he did not look for aloe.

Ms. Shepherd testified that on the evening of November 24, 2008, she met Detective Coleman at Children's Hospital to investigate allegations of abuse. The victim was in a private room located across from the nurse's station. The victim appeared "kind of fussy" and "very uncomfortable." Ms. Shepherd saw "red marks, burn injuries, blisters" on the victim's legs and buttocks. Detective Coleman interviewed the Appellant at the hospital. The Appellant said she had noticed the victim's injuries a few days earlier. Ms. Shepherd did not recall the Appellant's explaining how the victim got his injuries.

On cross-examination, Ms. Shepherd said that she did not recall if any medicine or bandages were on the victim's injuries. She did not remember if the Appellant said she tried to treat the victim's wounds with aloe. When Ms. Shepherd first walked in, the victim seemed uncomfortable, and "[h]e was whining and crying."

Jessica Wright testified that in November 2008, she was the receptionist at Powell Pediatrics. On a Thursday afternoon in November, the Appellant called the office and said that the victim was sick and that he "had blisters on his hands and feet." The Appellant made an appointment for that afternoon but later called back and rescheduled for the next morning. The Appellant changed the time of the Friday morning appointment to a couple of hours later that morning then rescheduled again for that afternoon. During the calls, the Appellant told Ms. Wright that the victim's "blisters had popped and they looked like burns." The Appellant did not keep the Friday afternoon appointment but called the office and asked if the doctor could see the victim on Saturday. Ms. Wright responded that the office was closed on Saturday and that if the victim was sick, the Appellant should take him to Children's Hospital. The Appellant told Ms. Wright that she was hesitant to take the victim to Children's Hospital because she feared DCS would be called.

On cross-examination, Ms. Wright said she told Dr. Tim Morris that the Appellant said the victim had blisters on his hands and feet, and Dr. Morris advised the Appellant that the victim needed to be seen by a doctor because he might be suffering from hand,

foot, and mouth disease. The Appellant responded that if she could not get to the doctor's office by the time the office closed at 5:00 p.m. on Friday, she would take the victim to Children's Hospital.

Sarah Powell testified that in November 2008, she was a child abuse investigator for Anderson County DCS. Around 10:00 or 11:00 a.m. on November 24, 2008, Ms. Powell went to the Appellant's residence. After introducing herself, Ms. Powell explained that DCS had received an allegation of abuse. The Appellant allowed her to come inside the residence, and they sat and talked for a while. The Appellant told Ms. Powell that the victim's injuries "looked like a sunburn at one point" and that "it could be hand, foot[,] and mouth disease."

After speaking with the Appellant, Ms. Powell looked at the victim and "saw a child with horrible burns that just had shiny raw spots on him that looked like chunks of skin were missing." Ms. Powell did not think the injuries looked like a sunburn. The burns were in multiple locations on the victim's body including his fingers, buttocks, and leg. The victim was frowning, did not move much, and could not open his eyes. Ms. Powell, concerned about the victim's condition, asked why the Appellant had not sought medical treatment for him and told her that she "had ten minutes to get him to Children's Hospital in Knoxville." The Appellant responded that she was scheduled to work that night. Ms. Powell told her that did not matter, that getting the victim treatment was a priority, and that she needed to find someone to watch her other children so she could take the victim to the hospital. Ms. Powell stayed until the Appellant complied with Ms. Powell's instructions.

On cross-examination, Ms. Powell said that she and the Appellant talked for approximately thirty minutes before Ms. Powell saw the victim. The Appellant said that she would never hurt her children and that she had put aloe on the victim's wounds. Ms. Powell recalled that the victim was wearing a diaper and was covered by a blanket, but she did not recall his wearing any other clothes. Ms. Powell said the victim's wounds were "shiny from being raw," but she did not see any salve on the wounds. Ms. Powell estimated that she was in the Appellant's residence for one and one-half hours.

Dr. Mary Palmer, who was allowed to testify as an expert in "pediatric abuse and pediatrics," testified that she practiced emergency medicine and child abuse pediatrics and that she worked at Children's Hospital. On November 25, 2008, she saw the victim and the Appellant for the first time. They were in a room in the ICU, and the victim was in "fair to critical" condition. Approximately fifteen percent of the victim's total body surface area was covered with second degree burns, which meant "the burn has extended into the layers of the skin so it separates them and you get a blistering of the skin." The burns were on the victim's buttocks, right inner thigh, left leg, top of left foot, right hand, and right elbow. Dr. Palmer said that the burns were "impressive but seemed to be

healing reasonably well" and that the victim appeared to be in "extreme pain and discomfort." Dr. Palmer said that all burns were "extremely painful" but that the pain lessened as the burn healed. Dr. Palmer said that the pain was the greatest during the first two or three days after the initial burn.

Dr. Palmer said that the corneas of the victim's eyes were "completely injured or burned" and that the injuries caused the eyes to appear "whitish-looking" when the doctor opened them for examination. Dr. Palmer opined that the eye injuries caused the majority of the victim's pain. Dr. Palmer said that the victim had to be given morphine before his eyes could be examined because otherwise it was "just too painful." Due to the pain, the victim did not open his eyes voluntarily until December 8, 2008, the day he was discharged.

Dr. Palmer thought that, when considering the pattern of the burns on the victim's body and the extensive injuries to the victim's eyes, it was likely the injuries were "thermal burn[s]" caused by a hot liquid being "splash[ed]" on the victim. In the alternative, the victim's eye injuries could have been caused by "a chemical liquid that burned the surface of the eyelid." Dr. Palmer said the wounds to the victim's "fingers were very circular" and could have been caused by a cigarette, a hot liquid, or a "caustic chemical."

Dr. Palmer said that if the victim had been seen immediately after the injury, doctors could have given him "narcotics as a first line of treatment" to alleviate his pain. Without such treatment, the victim suffered "extreme physical pain." The victim was hospitalized for two weeks and "healed substantially."

On cross-examination, Dr. Palmer acknowledged that the victim was prescribed Ciproflexin eye drops for pink eye and that the eye drops could cause "eyelid swelling, hives, [or] rashes" as side effects. The hospital did not continue to give the victim the eye drops. Dr. Palmer said that the eye drops could not have caused the injuries to the victim's eyes.

Dr. Palmer acknowledged that neither the hospital, law enforcement, nor DCS were able to determine definitively how the victim was injured. Dr. Palmer noted that although the victim's eyes were burned, his face was not burned. The doctor explained that if the burns were caused by a chemical, the majority of the chemical must have gone into the victim's eyes. The remaining chemical could have been cleaned from the victim's face easily but would have been harder to clean from his eyes. If the burns were caused by a hot liquid, damage to the face would have been more difficult to avoid, but any minor burns might have healed since five or six days had elapsed between the time of his injury and the time of his hospitalization. Dr. Palmer said a chemical burn would have caused blisters within twelve to twenty-four hours, and a hot liquid would have

caused blisters in less time. The Appellant told Dr. Palmer that the victim was "in excruciating pain," that "[h]e had not moved or crawled, pretty much had laid in bed for the entire week," and that she had tried to treat the burns with aloe. Dr. Palmer opined that aloe would not have stopped the pain of second degree burns and, in fact, could have been "irritative to [the victim's] nerves." Additionally, popping blisters increased the risk of infection and was not a recommended course of treatment.

Dr. Palmer said that while in the hospital, the victim mostly "laid there" and did not cry. She stated, "It's almost more pitiful to see someone in excruciating pain who no longer cries."

At the conclusion of the trial, the jury found the Appellant guilty of aggravated child neglect. The trial court sentenced the Appellant as a Range I, standard offender to twenty years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining her conviction.

## II. Analysis

The Appellant challenges the trial court's denial of her motion for a judgment of acquittal, which was made at the conclusion of the State's proof. However, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction . . . ." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the Appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct

and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in the indictment, aggravated child neglect occurs when a person commits child neglect, and the neglect results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1). Child neglect occurs when "[a]ny person . . . knowingly abuses or neglects a child . . . so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(b). If the victim is eight years old or less, the aggravated child neglect is a Class A felony. Tenn. Code Ann. § 39-15-402(b).

"A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2). Serious bodily injury is bodily injury that involves "[e]xtreme physical pain." Id. at (a)(34); see also Tenn. Code Ann. § 39-15-402(d) (providing that "'[s]erious bodily injury to the child' includes, but is not limited to, second- or third-degree burns . . . ").

"In order to establish neglect, the State must first prove that a defendant owes a legal duty to the child." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008) (citing State v. Mateyko, 53 S.W.3d 666, 671 (Tenn. 2001)). Generally speaking, "'a parent, guardian, or custodian'" has a duty "'to provide necessary medical, surgical, institutional or hospital care for [his or her] child." Id. at 405 (emphasis omitted) (citing Tenn. Code Ann. § 37-1-102(b)(12)(D)). Accordingly, as the victim's mother, the Appellant owed a legal duty to provide the victim with medical care.

The Appellant does not dispute that she neglected the victim. Instead, she argues that the State failed to prove that her act of neglect resulted in serious bodily injury to the victim in addition to that attributable to the act of abuse that initially caused his wounds. In support of this contention, the Appellant cites State v. Denise Wiggins, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716 (Tenn. Crim. App. at Jackson, Nov. 2, 2007). In Denise Wiggins, the defendant deliberately burned her child with an iron, put ointment and a bandage on the wound, but did not seek medical treatment for the child until another person discovered the burns. Id. at *1. After the burns were discovered, the defendant was charged with one count of aggravated child abuse and one count of aggravated child neglect. Id. A jury convicted the defendant of both offenses, and the trial court merged the convictions. Id.

On appeal, the defendant challenged the sufficiency of the evidence sustaining her convictions. Id. at *3-4. This court affirmed her conviction of aggravated child abuse. Id. at *4. However, this court noted that in order to sustain the defendant's conviction of aggravated child neglect, the State was required to prove that the defendant knowingly (1) "neglect[ed] a child so as to adversely affect the child's health and welfare"; (2) "the act of neglect resulted in serious bodily injury to the child"; and (3) "the child was six (6) years of age or less." Id. at *4-5 (citing Tenn. Code Ann. § 39-15-401, -402(a)(1),(b) (2003); T.P.I.--Crim. 21.01 (7th ed. 2000)). This court acknowledged that whether the defendant sought medical treatment for the child was relevant to establish neglect but that it was "not dispositive" of whether the act of neglect resulted in serious bodily injury to the child. Id. at *5. This court concluded that the proof failed "to demonstrate that it was the act of neglect, or failure to seek medical treatment, which *resulted* in serious bodily injury. Rather, the proof established that it was the [defendant's] act of abuse which produced the serious bodily injury to the victim." Id. (emphasis in original). Accordingly, this court concluded that the evidence was insufficient to sustain her conviction of aggravated child neglect. Id. at *1. This line of reasoning has been followed in cases similar to Denise Wiggins, and this court has held that when "a defendant is convicted of both aggravated child abuse and aggravated child neglect, . . . there must exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse." State v. Lakeisha Margaret Watkins, No. M2009-02607-CCA-R3-CD, 2011 WL 2682173, at *24 (Tenn. Crim. App. at Nashville, July 8, 2011).

In the instant case, the proof, taken in the light most favorable to the State, revealed the Appellant acknowledged that she noticed blisters on the ten-month-old victim's right pinkie finger and left toes on Wednesday, November 19, 2008, and she claimed she popped the blisters in an effort to heal them. She further acknowledged that on Thursday, November 20, 2008, she saw more blisters on the victim's left leg and buttocks. She called Powell Pediatrics and made several appointments for that day and the next but never took the victim to the doctor. During the scheduling calls, the Appellant was cautioned that the victim should be taken to a doctor or Children's Hospital, but she did not take the child for treatment because she feared DCS would be called. DCS employee Ms. Powell went to the Appellant's home on November 24 and saw "horrible" burns on the victim's body. At Ms. Powell's insistence, the Appellant took the victim to Children's Hospital. He was placed in the pediatric ICU, and his condition was determined to be "fair to critical." Approximately fifteen percent of his total body surface was covered with second degree burns, and his corneas were completely burned, which caused the majority of his pain. The victim had to be given morphine before his eyes could be examined because the pain was "excruciating."

The State did not seek a conviction relating to the actual infliction of burns to the victim. In fact, the proof adduced at trial revealed that the exact cause of the victim's

injuries could not be determined.  Nevertheless, the proof also revealed that the burns were most likely caused by a hot liquid or a caustic chemical, either of which would have resulted in blisters within twelve to twenty-four hours or less after injury.  Despite noticing the victim's blisters and his obvious pain and being advised he needed to be seen by a doctor, the Appellant did not take him for medical treatment until she was forced to do so five or six days after he was injured.  The first two or three days of the victim's burns were the most painful, and proof was presented that he could have been treated immediately with narcotics and steroids to lessen the swelling and decrease the pain from his eye injuries.  The lack of medical treatment caused him to suffer excruciating pain.  We conclude that a reasonable jury could have found from the foregoing that the Appellant was guilty of aggravated child neglect.

## III.  Conclusion

We conclude that the evidence is sufficient to sustain the Appellant's conviction of aggravated child neglect.  The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE